**Patricia BADLAM, Plaintiff,**

v.

**REYNOLDS METALS COMPANY and United Steelworkers of America, The Aluminum, Brick and Glass Division, Local No. 450–A, Defendants.**

**Susan McGregor, Plaintiff,**

v.

**Reynolds Metals Company and United Steelworkers of America, The Aluminum, Brick and Glass Division, Local No. 450–A, Defendants.**

**Edna Norton, Plaintiff,**

v.

**Reynolds Metals Company and United Steelworkers of America, The Aluminum, Brick and Glass Division, Local No. 450–A, Defendants.**

**Nos. 95 CV 1100, 95 CV 1105 and 95 CV 1118.**

United States District Court, N.D. New York.

April 19, 1999.

Poissant, Nichols Law Firm, Malone, NY, for plaintiffs Badlam and Norton; Kevin F. Nichols, of counsel.

Ali, Pappas Law Firm, Syracuse, NY, for plaintiff McGregor; Thomas P. Givas, David P. Doherty, of counsel.

Chamberlain, D'Amanda Law Firm, Rochester, NY, for defendant United Steelworkers of America; Michael Harren, of counsel.

Mackenzie, Smith Law Firm, Syracuse, NY, for defendant Reynolds Metals Co.; Kevin M. Reilly, of counsel.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

The three female plaintiffs herein, Edna Norton ("Norton"), Patricia Badlam ("Badlam"), and Susan McGregor ("McGregor"), commenced the instant litigation against the Defendants Reynolds Metals Company ("Reynolds") and The Aluminum Brick and Glass Workers International Union Local No. 450 (the "Union") asserting claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law § 296 ("HRL"), and common law causes of action for negligent hiring, retention and supervision. Plaintiff Norton also asserts a claim for defamation. Presently before the Court are motions by both defendants pursuant to FED.R.CIV.P. 56 seeking dismissal of the Complaints in their entirety.

## I. BACKGROUND

Because this is a motion for summary judgment by the defendants, the following facts are presented in the light most favorable to plaintiffs. *See Ertman v. United States*, 165 F.3d 204, 206 (2d Cir.1999).

The instant litigation stems from alleged occurrences at Reynolds' St. Lawrence Reduction Plant (the "plant") in Massena, New York. Essentially, plaintiffs allege that male coworkers sexually harassed them, that they continuously complained to their supervisors to no avail, and that the Union failed to file grievances on their behalf.

### A. Norton

Norton began working for Reynolds in 1980. In 1987, she began working in

Reynolds' Cast House. Norton began experiencing ill treatment in the early 1990s. Specifically, she alleges that she was the subject of sexual innuendos, profanity, derogatory comments, and sexually offensive touching, and has been exposed to pornography, male workers exposing themselves, and crude graphic depictions on the walls. For example, Norton asserts that she was constantly referred to as an "old cunt," "slut," "whore," "bitch," "dyke," and "prostitute;" certain male workers tried to have her grab their penises; coworkers exposed themselves to her; she found sexually explicit photographs in her locker; coworkers ran their tongues in and out in a sexually explicit manner; and she witnessed pornographic videos and magazines throughout the workplace, profanity, and tasteless drawings. Norton further alleges that she was treated differently than male employees because she was required to retrain on a crane on account of her sex.[1] Norton asserts that she repeatedly complained to supervisors, upper-level management, the plant superintendent, Reynolds' corporate headquarters, Union stewards, the Union vice-president, and the Union president, all to no avail.

The Union attempted to resolve Norton's complaints informally by speaking directly with Norton's coworkers and setting up meetings with Reynolds officials. The Union arranged meetings with Norton, her supervisor, Eric Prashaw; Cast House Superintendent, Terry Conroy; Plant Manager, Fred Swafford; Director of Human Resources, Les Carey; and Cast House Superintendent, Alf Maki. The Union also advised Norton to follow Reynolds' sexual harassment policy, including contacting Reynolds' EEO office at Corporate Headquarters.

Norton alleges that the Union failed to take any effective action on her behalf and that it failed to rectify a breach of the Union contract by not filing a grievance. Norton similarly contends that Reynolds did not have an effective sexual harassment policy and that it failed to take appropriate corrective action. In sum, Norton claims that she was discriminated against on the basis of her sex with respect to the terms and conditions of her employment with Reynolds and her rights and privileges as a Union member.

## B. Badlam

Badlam commenced employment with Reynolds in 1989 where she worked continuously until an industrial accident on September 6, 1991. After a period of disability leave, Badlam returned to work without restriction. In February 1993, Badlam's physician again declared her disabled. On or about February 15, 1993, her physician released her to return to light-work duty with certain medical restrictions. Throughout 1992 and 1993, Badlam received workers compensation and disability payments when she was out of work.

Badlam contacted Union President Jim Peets ("Peets") for assistance in obtaining light-work duty at Reynolds. Peets apparently contacted Reynolds and was informed that no light duty positions were available.

In May 1994, Badlam underwent a functional capacity examination, the results of which indicated that her medical condition had improved. In July 1994, Badlam's attorney contacted Peets for further assistance. Peets requested that Badlam provide him with the relevant medical information regarding her restrictions so he could properly represent her interests in negotiating her return to work.

Peets pursued the matter and was advised by Reynolds that Badlam could return to her regular position as a Cast House worker. Badlam, however, insisted

---

**1.** Norton alleges that she had completed the qualifying period to operate a crane, but that male coworkers refused to work with her while she operated the crane. Norton further asserts that Reynolds required her to undergo additional training, but that male employees were never required to have additional training.

upon a light duty position. Badlam ultimately returned to work as a Cast House worker on November 7, 1994 after being cleared by Reynolds' medical department. Badlam continued to work in the Cast House until she resigned on April 17, 1995.

Like Norton, Badlam contends that she was continuously subjected to a hostile work environment while employed at Reynolds and was the brunt of sexual innuendo, offensive comments, crude graphic depictions, and disparate treatment by her co-workers. For example, Badlam alleges that she was constantly called a "cunt," that coworkers mocked her on account of her breasts, that a male coworker struck her in the face, that coworkers requested her to wear sexy clothing, that coworkers told her to stay home and get pregnant rather than work, and that she found a drawing of a nude women with her name on it next to an erect penis. Badlam also asserts that the Union failed to represent her on account of her gender because it did not take appropriate action to rid Reynolds of sexual harassment.

### C. McGregor

McGregor began working at Reynolds in 1990. On January 1, 1993, McGregor was injured in an automobile accident and was deemed totally disabled by her personal physician until July 1994. In November 1993, McGregor was laid off due to a reduction in force, but was later recalled in accordance with the Collective Bargaining Agreement ("CBA").

At the time McGregor was recalled, she had a medical restriction limiting her to lifting thirty pounds. Because of that restriction, she could not return to work at the time of recall and was permitted to waive recall under the CBA. Thus, McGregor remained on layoff. McGregor later contacted the Union and Reynolds' Human Resources Department for assistance in obtaining light-duty work. Reynolds apparently stated that McGregor could return to the Cast House if her lifting restrictions were raised to fifty pounds. Ap-

proximately one month later, McGregor contacted her physician, who raised her lifting restrictions to forty-five pounds. Peets contacted Reynolds about finding a position that did not require lifting. Reynolds determined that it had a vacancy in the Labor Pool, which could accommodate McGregor's restrictions.

Accordingly, McGregor returned to work in the Labor Pool on August 8, 1994 until she was rendered disabled with back pain on September 27, 1994. The Union intervened on McGregor's behalf and requested that Reynolds place her in a position that could accommodate her occupational restrictions. On November 29, 1994, Reynolds provided McGregor with a temporary position sweeping the maintenance shop area. This temporary assignment ended in March 1995, when McGregor was returned to her regular position in the Labor Pool.

McGregor then filed a grievance requesting that Reynolds reevaluate her restrictions. The Union pursued the grievance to the "Third Step" of the grievance procedure outlined in the CBA. The grievance was denied because there was no longer a vacancy in maintenance. On March 31, 1995, McGregor again left work on disability.

In September 1995, McGregor filed another grievance protesting her "unlawful termination" and requesting a light duty position. The Union pursued that grievance to Step Three where, according to the Union, the grievance was denied because McGregor was not terminated and Reynolds had no vacancies available within her restrictions.

McGregor returned to work in January 1997 and was permanently assigned to a janitor position. She claims that during her employment at Reynolds she also has been subjected to a hostile work environment and was denied representation by the Union because of her sex. McGregor alleges that coworkers touched her buttocks, referred to her as "fat ass," "dumb

cunt," and a "fucken bitch;" and that she repeatedly found pornography in the workplace.

Defendants now move for summary judgment seeking dismissal of the Complaints in their entirety.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.,* 68 F.3d 1488, 1492 (2d Cir.1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the nonmovant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [ ] rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e); *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996).

The Court is aware of the dangers of summary judgment in connection with a Title VII claim. "Because direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994)). "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp,* 118 F.3d at 110 (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985), *cert. denied* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985)).

With this standard in mind, the Court will now address defendants' motions for summary judgment.

### B. Reynolds' Motion for Summary Judgment

Reynolds moves for summary judgment arguing that: (1) plaintiffs failed to avail themselves of Reynolds' sexual harassment policy and complaint procedures; (2) Reynolds exercised reasonable care to prevent and correct any alleged sexual harassment; and (3) plaintiffs' complaints of harassment are non-actionable because they would be equally offensive to both sexes and, thus, plaintiffs were not singled out because of their sex. Plaintiffs respond that Reynolds' sexual harassment policy and complaint procedure is insufficient, plaintiffs repeatedly complained to Reynolds' officials who failed to take corrective action, and plaintiffs were subjected to rude, obscene, and vulgar treatment because of their sex.[2]

---

**2.** The Court initially notes that, in response to defendants' motions for summary judgment, plaintiffs have submitted the entirety of their deposition transcripts stating that "the transcript citations in support of the [ ] elements of a hostile work environment are so numerous and cumbersome, that individual citations in this affirmation would fill at least two pages, and therefore, be of no value to the court." Papworth Aff., at ¶ 22; Nichols Aff., at ¶ 25. Plaintiffs then "implore" and "be-

seech" the Court to read the entire deposition transcripts. Papworth Aff., at ¶ 23; Nichols Aff., at ¶ 25.

It is not this Court's function to filter through over one thousand pages of deposition testimony in an attempt to find plaintiffs' claimed triable issues of fact. Lawyering is to be done by lawyers, not the Court. Plaintiffs are quite presumptuous in concluding that providing citations to the record would be of no value to the Court. The Court could not disagree

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e–2(a). Title VII is not limited to economic or tangible discrimination, but extends to "sexual harassment so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (internal quotations and citations omitted). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986).

In the present case, plaintiffs assert a hostile work environment sexual harassment claim against defendants. To prevail on their hostile work environment claims against Reynolds, plaintiffs must demonstrate: (1) that their workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of their work environment, see *Faragher*, 118 S.Ct. at 2283 n. 1; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to Reynolds. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); see *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996).[3]

## 1. Whether Reynolds Was Permeated with Discriminatory Intimidation that was Sufficiently Severe or Pervasive to Alter the Conditions of His Work Environment

To be actionable, "[t]he conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110; see *Faragher*, 118 S.Ct. at 2283 ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."). In determining whether an environment is sufficiently hostile or abusive, courts examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Faragher*, 118 S.Ct. at 2283. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citations and quotations omitted). In other words, Title VII is not to be used as "a general civility code," but is actionable only for conduct sufficiently "extreme to amount to a change in the terms and conditions of employment." *Id.* Pervasiveness and severity are independent and equal grounds on which to support violations of Title VII. *Faragher*, 118 S.Ct. at 2283 (ex-

---

more. By "providing precise citations to the record where the disputed [or undisputed] facts are located, both parties and the Court can move immediately to the gravamen of the case; absent this forced focus, the parties' briefs can remain, as is often the case, as 'two ships passing in the night'.... If the facts supporting the arguments are in the record, counsel should be able to cite to them." *Riley v. Town of Bethlehem*, 5 F.Supp.2d 92, 93 (N.D.N.Y.1998).

Because the brunt of counsels' neglect will be borne by their clients, however, the Court has

parsed the record. Suffice it to say that plaintiffs' attorneys' failure to adhere to local rule practice in the future will not be treated with such compassion.

3. Because New York courts require the same standard of proof for claims brought under the HRL as for those brought under Title VII, the following analysis applies to both the Title VII and HRL claims. See *Tomka v. Seiler*, 66 F.3d 1295, 1305 n. 4. (2d Cir.1995).

tremely serious isolated incidents may be actionable); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (there must be conduct that is "sufficiently severe or pervasive") (emphasis supplied); *see Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir.), *cert. denied*, ── .U.S. ──, 119 S.Ct. 188, 142 L.Ed.2d 153 (1998); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998); *Tomka*, 66 F.3d at 1305; *Torres v. Pisano*, 116 F.3d 625, 631 n. 4 (2d Cir.), *cert. denied*, ── U.S. ──, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

■ In this case, the evidence before the Court, including deposition transcripts, responses to interrogatories, and other documentary evidence, is sufficient to create a factual dispute that plaintiffs were subject to a hostile work environment. Specifically, plaintiffs presented evidence that they were repeatedly subjected to sexual innuendo, rude and offensive comments, pornographic materials, and explicit, tasteless drawings and written profanity by their male coworkers. For example, Norton was constantly referred to as an "old cunt," "old dyke," "slut," "whore," and "prostitute." *See, e.g.*, Norton Dep., at 9 ("the old cunt"), 26 ("bitch"), 34 ("old cunt"), 58 ("the old dyke is at it again"), 206, 272–73 ("slut, whore, dyke and prostitute"), 386 ("ride the horse cock and get great vibrations from it" [4]), 393 (coworkers grabbing their genitals and yelling to one another to "suck this you cock sucker."), 395 (coworker "went through the motion for [Norton] to pull [down her] pants and told [her] to put buck lure all over [her] ass."), 395–96 (coworkers continuously grabbing and playing with their "privates"), 400 (coworkers grabbing other male coworkers' "private part"), 411 (coworker wanted her to grab his penis), 420 (coworker asked her if she "wanted to play

with his privates."), 426–27 (coworker grabbed Norton's hand and directed it towards his penis), 440 (same), 439 (coworker stands underneath her and "run[s] his tongue in and out ... in a sexual manner"), 440–41 (coworker exposes himself to Norton), 444, 447 (obscenities written on mirror); 448 (writing on mirror "What is Edna, a dyke, half man, half woman, prostitute."), 449–50 ("old dyke"), 453, 461–62, 466, etc.; Nichols Aff., Exs. "B" (affidavit of former Reynolds employee that she observed obscene words and drawings at Reynolds and was subjected to sexual insults), "D" (distasteful sexual documents, pictures, and cartoons found by Norton at Reynolds), "E" (pictures of: (1) drawings of nude woman found at Reynolds, (2) profanity on the walls, and (3) alterations made to the signs on the women's rest room) witnessed by Norton at Reynolds), "F" (covers of pornographic magazines such as *Hustler* and *Playboy* found by Norton at Reynolds), and "G" (sexually explicit photograph placed in Norton's locker at Reynolds).[5]

Similarly, Badlam has presented sufficient evidence to create a triable issue of fact as to whether she was subjected to a hostile work environment. For example, she presented evidence of despicable behavior and conduct including being the subject of ridicule on account of her breasts, negative stereotyping suggesting that she stay home and get pregnant, generally being treated differently than male workers, and being slapped in the face. *See* Badlam Dep., at 233 ("cunt"), 236 (same), 242–43, 212 (alleged disparate treatment by coworkers on account of sex), 219 (same), 221 (mocking Badlam's breasts), 225 (coworker strikes her in the face), 228 (coworker requesting Badlam to wear a grass skirt or something sexy), 246–48 (coworkers blew smoke in her

---

**4.** "Horse cock" is a term that Reynolds workers apparently gave to a phallic cleaning tool.

**5.** Norton has submitted an affidavit stating that she personally found, observed, or witnessed the materials contained in Exhibits

"B", "D", "E", and "F", and, therefore, having been authenticated, they may be considered by the Court on this motion for summary judgment.

face), 260, 275 (efforts by the men to slow down Norton's and Badlam's work production), 284 (supervisor told her that the forklifts belonged to the men), 301, 318 (coworker advising Badlam to "stay home and get pregnant and barefoot like most woman do, instead of coming into the workplace"), 328 (drawing near Badlam's work station of nude woman with Badlam's name on it next to an erect penis), 340, 345–46 (coworker stating "Patty, you should have been in here five minutes ago. I had the biggest fucking hard-on you ever saw."), 351, etc.

Likewise, McGregor has presented sufficient evidence to create a factual dispute as to whether she was subject to a hostile work environment. *See* McGregor Response to Reynolds' Interrogs, at pp. 8 (unwanted touching of her buttocks), 9 (offensive and vulgar comments including "fat ass," "dumb cunt," and "fucken bitches"), 26, 28 (repeated instances of pornographic materials in the workplace); McGregor Response to Union's Interrogs, at ¶ 11 (co-employee measuring her buttocks with both hands on each side of her buttocks, co-workers calling her "Crisco," "fat in the can," "lard ass," and "fat ass.").

The above citations to the record make it clear that these were not isolated, sporadic instances, but were part and parcel of plaintiffs' every day life at Reynolds, particularly in 1994 and 1995. *See Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992); *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (2d Cir.1989). This offensive conduct is strikingly similar to that which the Second Circuit has already found sufficient to demonstrate a hostile work environment for purposes of a motion for summary judgment. *See Torres,* 116 F.3d at 628 ("dumb cunt," insulting remarks about the size of plaintiff's breasts and buttocks, sexual innuendos, crude remarks, comments that plaintiff should stay at home, and referring to plaintiff as a prostitute). "If a jury were to credit [plaintiffs'] general allegations of constant abuse, ... it could

reasonably find pervasive harassment, even in the absence of specific details about each incident." *Torres,* 116 F.3d at 631 (citing *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1456 (7th Cir.1994)); *Fernot v. Crafts Inn, Inc.,* 895 F.Supp. 668, 677 (D.Vt.1995); *DiLaurenzio v. Atlantic Paratrans, Inc.,* 926 F.Supp. 310, 314 (E.D.N.Y.1996).

Plaintiffs also have adequately demonstrated that the alleged conduct could reasonably be perceived, and was perceived, as a hostile environment. It is clear that plaintiffs were personally offended by the harassment because they repeatedly complained to their supervisors and asked their co-workers to discontinue their inappropriate behavior. With respect to the objectivity requirement, a fair-minded jury could reasonably conclude that reasonable women would find their working conditions altered and abusive when various co-workers referred to them as "dumb cunt," "bitch," "whore," "dyke;" mocked their physical appearance, including their breasts and buttocks; made sexually suggestive innuendos, exposed themselves, and otherwise subjected them to crude remarks, behavior and pornography. *See Torres,* 116 F.3d at 633; *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir. 1998); *Ellison v. Brady,* 924 F.2d 872, 879 (9th Cir.1991). Thus, this is not, as Reynolds would have this Court believe, mere horseplay or intersexual flirtation.

## 2. Whether The Harassing Conduct Was Motivated by Gender

It is not enough that plaintiffs be subjected to harassment; rather, plaintiffs are required to show that the harassment complained of was gender based. *Galdieri–Ambrosini v. National Realty & Development,* 136 F.3d 276, 289 (2d Cir.1998). Reynolds goes to great lengths to argue that the behavior of its employees is equally offensive to both men and women and, thus, was not gender based. While it is true that male and female employees alike were exposed to certain pornographic materials and offensive conduct and language,

there is evidence that certain harassment was directed only at the female plaintiffs.

For example, some of the pornographic drawings specifically referenced plaintiffs. Norton found a sexually explicit photograph slipped into her locker. Badlam's initials were written on a sexually explicit drawing. The terms used to refer to plaintiffs such as "cunt," "dyke," "bitch," and "whore" are usually associated with females. In other words, some of the offensive conduct described above *is* linked to plaintiffs' gender and, thus, can fairly said to be based on gender. *See Fair v. Guiding Eyes for the Blind, Inc.*, 742 F.Supp. 151, 156 (S.D.N.Y.1990); *E.E.O.C. v. A. Sam & Sons Prod. Co., Inc.*, 872 F.Supp. 29, 35 (W.D.N.Y.1994) ("[T]he term 'whore' is usually gender-specific and is certainly more offensive when directed at a woman. Thus the inference is sufficiently strong that [the] conduct was directed at [plaintiff] because she was a woman."); *Galloway v. General Motors Serv. Pts. Ops.*, 78 F.3d 1164, 1168 (7th Cir.1996); *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1539 (10th Cir.1995); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir.1996) (noting that "curb side cunt" and "bitch" are "sexual epithets that have been identified as 'intensely degrading' to women."); *Burns v. McGregor Electronic Indus. Inc.*, 989 F.2d 959, 964 (8th Cir.1993) ("bitch," "slut," and "cunt" are obscene name calling and constitute harassment based on sex); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 215–16 (N.D.N.Y.1999).

**3. Whether Reynolds May Be Held Liable for a Hostile Work Environment**

The Court must next address whether there is a basis for imputing liability to Reynolds. Reynolds claims that it cannot be held liable because it provided a reasonable avenue of redress and plaintiffs failed to avail themselves of the sexual harassment procedure. Specifically, Reynolds maintains that plaintiffs never complained to anyone at Reynolds, that they never availed themselves of the opportunity of contacting Reynolds' Equal Opportunity Affairs Officer at corporate headquarters, and that receipt of the EEOC charge was the first time Reynolds became aware of any complaint of sexual harassment. *See* Leonard Aff., ¶ 21. Plaintiffs respond that Reynolds' sexual harassment policy was ineffective and that they repeatedly complained to their supervisors to no avail.

Here, the sexual harassment is alleged to have been perpetrated by co-employees. "When a 'co-employee'—as distinct from a supervisor—is alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.'" *Quinn,* 159 F.3d 759, 766 (quoting *Tomka v. Seiler,* 66 F.3d at 1305); *see* 29 C.F.R. § 1604.11(d) ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer ... knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").[6]

Under Title VII, an employer need not have actual knowledge of the harass-

---

**6.** Employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor. *Quinn,* 159 F.3d at 767 (citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998)). "However, the employer will avoid liability if it can plead and prove, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise." *Id.*

ment; an employer is considered to have notice of sexual harassment if the employer—or any of its agents or supervisory employees—knew or should have known of the conduct. See *Murray*, 57 F.3d at 249. The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles. See *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). An official's knowledge will be imputed to an employer when:

(A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment. *Id.* at 636–37 (citations omitted).

*Distasio*, 157 F.3d 55, 63. Accordingly, the Court must inquire whether: (1) a Reynolds official knew or had reason to know of the alleged sexual harassment; and (2) that official's knowledge may be imputed to Reynolds.

### a. Whether A Reynolds Officials Knew of the Harassment.

■ Despite Reynolds claims to the contrary, the deposition testimony demonstrates that many of the alleged acts of sexually discriminatory behavior were reported to, or occurred in front of, supervisors and foremen including Eric Prashaw, Terry Conroy, and Bill Boak. *See, e.g.,* Norton Dep., at 416–17, 423, 427–28, 432, 442; Badlam Dep., at 214, 222, 243, 304, 330, 346; McGregor Response to Reynolds' Interrogs., at 9, 14, 17. Many of these instances occurred prior to the filing of the EEOC charges. *See e.g.* Norton Dep., at 426–28, 440–42, 449–51; Badlam Dep., at 211–214, 241–43, 301–04, 345–46; McGregor Response to Reynolds' Interrogs., at 14, 17. The evidence further demonstrates that several instances were reported to Pam Leonard, a human resources representative at Reynolds. See Norton Dep., at 10, 112–15, 450–51 (instance reported to Leonard in 1994). Thus, a triable issue of fact remains whether Reynolds officials knew of instances of sexual harassment regarding plaintiffs.

### b. Whether the Knowledge of Sexual Harassment May be Imputed to Reynolds

The next question is whether knowledge of sexual harassment by certain supervisors may be imputed to Reynolds. This entails an examination of Reynolds' sexual harassment policies. As of 1991, Reynolds' sexual harassment policy stated that "an employee who is subjected to sexual harassment is strongly urged to promptly report such harassment or intimidation to his or her supervisor or the appropriate personnel official ... or to ... [the] corporate director, equal opportunity affairs. All such complaints or concerns ... will be promptly investigated." See Leonard Aff., Ex. "A" (the "1991 policy"). Because employees were directed to complain to their supervisors and the company promised to promptly investigate the complaints, the 1991 policy imposed a duty upon the supervisors to act and stop the harassment. *See Distasio*, 157 F.3d at 63.

By 1994, Reynolds' sexual harassment policy provided that:

Any employee who is aware of any instance of sexual harassment ... should report the alleged act immediately to his or her supervisor. If the employee is uncomfortable in discussing the matter with the supervisor or if the supervisor is not available, the employee should report the alleged act immediately the supervisor's supervisor and/or the appropriate Personnel Official ... or [the] Corporate Director, Equal Opportunity Affairs.... Supervisors and managers who receive such a complaint are to contact the Personnel Office immediately.

*Id.* (the "1994 policy"). Under the 1994 policy, supervisors were clearly charged with a duty to inform Reynolds of any harassment of which they were aware.

Under the 1991 and 1994 policies, plaintiffs were to bring complaints of sexual harassment to their supervisors. They were not required to report sexual harassment to corporate headquarters as Reynolds suggests; that was merely another avenue of redress. *See Distasio,* 157 F.3d at 65 ("Implicit in this argument is the notion that the plaintiff has an affirmative duty to bring her allegations to the company's attention in more than one way when she believes the company's response to her harassment claim is inadequate. We reject this attempt to shift the company's failure to respond onto the plaintiff's shoulders. When a plaintiff reports harassing misconduct in accordance with company policy, she is under no duty to report it a second time before the company is charged with knowledge of it."). Rather, the sexual harassment policies imposed an affirmative duty upon supervisors to take action once they had knowledge of sexual harassment. *Id.* Thus, upon being informed of, or personally viewing, instances of sexual harassment, the supervisors were required to take appropriate action. Because plaintiffs complained to their supervisors of sexual harassment, certain supervisors witnessed some of the alleged harassment, and the supervisors were obliged to take appropriate action, Reynolds is charged with the knowledge of plaintiffs' complaints of sexual harassment. *Distasio,* 157 F.3d at 63 ("In light of this policy, requiring [the supervisor] to inform the company of reported · harassment that came to his attention, [the employer] is charged with knowledge of the harassment to the same extent as [the supervisor].").

Because Reynolds is deemed to have knowledge of the alleged harassment, it may escape liability only if it demonstrates that it took appropriate action in response thereto. Reynolds offers no evidence that it took appropriate action and, thus, has not sustained its burden on summary judgment. Accordingly, Reynolds' motion for summary judgment on the Title VII and Human Rights Law claims is denied.

### C. Union's Motion for Summary Judgment

The Union moves for summary judgment on the Title VII claims asserting that it did not breach its duty of fair representation ("DFR") and there is no evidence that the Union's actions were motivated by discriminatory animus. The Union claims that it has no independent duty to file a grievance on behalf of a member absent a specific request. The Union further asserts that plaintiffs have failed to demonstrate that they suffered any adverse employment action sufficient to sustain a claim of retaliation.

Pursuant to 42 U.S.C. § 2000e–2(c):

It shall be an unlawful employment practice for a labor organization [ ] to exclude or to expel from its membership, or otherwise discriminate against, any individual because of ... sex ....; [or] to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

There is no published decision of the Second Circuit stating the appropriate test to be applied to a Title VII action against a Union. The district courts within this Circuit have held that a prima facie case is established against a Union by demonstrating that: (1) the Union Defendants breached the DFR by allowing an ·alleged breach of the CBA to go unrepaired; and (2) the union defendants' actions were motivated by animus to a protected class. *See Szarka v. Reynolds Metals Co.,* 17 F.Supp.2d 115, 125 (N.D.N.Y.1998); *Doolittle v. Ruffo,* 1996 WL 159850, at *4 (N.D.N.Y. March 27, 1996); *Ross v. Communication Workers of Am., Local 110,* 1995 WL 351462 (S.D.N.Y. Jun.9, 1995), *aff'd,* 100 F.3d 944, 1996 WL 80688 (2d Cir.1996). Other circuits have adopted ·similar tests. *See York v. American Telephone & Telegraph Co.,* 95 F.3d 948, 955

(10th Cir.1996); *Bugg v. Int'l Union of Allied Ind. Workers of Am., Local 507 AFL—CIO*, 674 F.2d 595 (7th Cir.1982), *cert. denied*, 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1982); *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1104 (6th Cir. 1981). Accordingly, the Court applies the two-part test articulated in *Szarka* and *Doolittle*.

### 1. Whether the Union Breached its DFR

■ "A breach of the [ ] duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967). With respect to each plaintiff, the Union argues that it did not breach the DFR because: (1) there was no breach of the CBA; (2) the plaintiffs failed to request the Union to pursue a grievance on their behalf; (3) the Union did take action on behalf of the plaintiffs when requested; and (4) there is no evidence that the Union was motivated by a discriminatory animus towards women.

The plaintiffs counter that sex discrimination is prohibited by the CBA, a hostile work environment is pervasive at Reynolds, Union officials knew of the discriminatory work environment, the existence of a hostile work environment at Reynolds constitutes a breach of the CBA, and that the Union failed to remedy this breach. Plaintiffs contend that the Union refused to file grievances on their behalf and that it acquiesced in the harassment occurring at Reynolds. Plaintiffs further allege that the Union was motivated by gender animus and acted in bad faith because the Union never required male employees to file a written grievance before the Union took further action, the Union believes it to be under no affirmative duty to act to prevent, stop, or correct sex discrimination in the workplace, and some of the Reynolds' employees who allegedly engaged in harassing behavior were also Union stewards.

■ "Under Title VII, a union may not refuse to file a valid discrimination claim against an employer on behalf of one of its members simply because [of] that member[s][sex]." *York*, 95 F.3d at 956 (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 2623–25, 96 L.Ed.2d 572 (1987)). Thus, several circuits have held that " '[a] union cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability for such discrimination.' " *Id.* (quoting *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1311 (10th Cir.1980)); *Woods v. Graphic Communications*, 925 F.2d 1195, 1200 (9th Cir.1991) ("A union may [ ] be liable under Title VII for acquiescing in a racially discriminatory work environment."). "Acquiescence requires (1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim." *Id.* (citing *Goodman*, 107 S.Ct. at 2625).[7]

Here, the CBA obligates both the Union and Reynolds "not to discriminate against any employee because of ... sex ... in all matters pertaining to hiring, wages, hours, and working conditions." CBA, Art. XXV. However, as will be seen, there is no evidence that the Union itself discriminated

---

7. It is questionable whether mere acquiescence is sufficient to support a Title VII claim against a Union. The Supreme Court purposefully avoided this question in *Goodman*, noting that the declaration "that mere union passivity in the face of employer discrimination renders the union liable under Title VII ... [is a] rather abstract observation." *Goodman*, 107 S.Ct. at 2623. Instead the Court chose to base its decision upon a finding of "far more than mere passivity." *Id.; see* *Goodman*, 107 S.Ct. at 2635 (Title VII imposes no affirmative obligation on unions to remedy discrimination by the employer) (Powell, Scalia, O'Connor, concurring in part and dissenting in part); *Martin v. Local 1513 and District 118 of the International Assoc. of Machinists and Aerospace Workers*, 859 F.2d 581, 584 (8th Cir.1988). Assuming, however, that a showing of passivity is enough, for reasons to be stated, plaintiff's claim must, nonetheless, fail.

against plaintiffs on the basis of sex, that the Union acquiesced in prohibited sex discrimination, that the Union refused to file proffered grievances, that the Union ignored grievances based on instances of alleged sexual harassment, or that the Union refused to include assertions of sexual harassment in grievances that also asserted other contract violations. *See Goodman,* 107 S.Ct. at 2624.

### a. Norton

 Based upon the evidence before the Court, no rational jury could conclude that the Union breached its DFR because it assisted Norton in attempting to resolve her issues with Reynolds, Norton never requested that a grievance be filed or pursued, and the Union was willing to pursue a grievance on her behalf as it had done in the past.

Norton brought her allegations of harassment to the attention of Union officials on numerous occasions. Some of these allegations involved actions of Union stewards. Although the Union had knowledge that prohibited discrimination may have occurred, see Aff. of John Thompson; July 7, 1998 Aff. of James Peets; July 7, 1998 Aff. of John Hicks, it did not ignore Norton's complaints of sexual harassment. The Union attempted to ameliorate Norton's problems by conducting meetings with Norton's supervisors, co-workers, and members from Reynolds' management and personnel department. *See* CBA, Art. VI, Sec. 2, Step. 1; Thompson Aff., at ¶¶ 8–9; 11–16; July 7, 1998 Hicks Aff., at ¶¶ 6–13; 17–28; 35; 64–65. Union officials also advised Norton to complain to Reynolds' Personnel Department and to follow Reynolds's sexual harassment policy, including calling Corporate Headquarters.

Significantly, Norton never requested the Union to file a grievance on her behalf. *See* Norton Dep. at 640–47. Norton admitted at deposition that she was aware of her ability to file written grievances with the Union, but that she declined to do so. *See* Norton Dep. at 133–34; 139–42; 623–26; 628–30; 641–44. Without the filing of

a written grievance or otherwise specifically requesting that the Union pursue a grievance to the next step, the Union was under no obligation to take further action on her behalf. *See Flanigan v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Truck Drivers Local No. 671,* 942 F.2d 824, 829 (2d Cir.1991); *Mechmet v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1178 (7th Cir.1987) ("[I]f a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him."); *Patel v. Albano,* 1998 WL 726475, at * 3 (S.D.N.Y. Oct.13, 1998) ("[T]he ... Complaint [does not] state a claim ... [because] [a]t no place is it alleged that plaintiff ever requested [a union official] to file a formal grievance or take any official action."). Norton's unilateral expectation that the Union enforce her right to a discrimination free work environment guaranteed by the CBA, see Norton Aff., at ¶ 5, is insufficient to trigger the Union's duties. *See Goodman,* 107 S.Ct. at 2635 (Title VII imposes no affirmative obligation upon union to remedy an employer's discrimination) (Powell, Scalia, O'Connor, JJ., concurring in part and dissenting in part); *Carter v. Chrysler Corp.,* 95–CV–1298, at 3–4 (E.D.Mo. Apr. 7, 1998) ("Certainly, if it has not been established that a union is liable for its acquiescence, then it has not been established that Title VII shoulders unions with an affirmative obligation to maintain a harassment or discrimination-free workplace."). Thus, it cannot be said that the Union acquiesced in any sex-based discrimination at Reynolds.

 Norton's allegation that a Union steward engaged in the sexual harassment at Reynolds does not alter the result. Shop stewards are not officers of the Union. *See* Const. and By-Laws of Local 450, Art. XIII, § 6. "Certainly a union is not responsible for every act of a shop steward, simply by virtue of his position. If he acts only as an individual rather than within the authority the union has con-

ferred, the union is absolved." *N.L.R.B. v. Local 815, International Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of America,* 290 F.2d 99, 104 (2d Cir. 1961); *see also N.L.R.B. v. Local Union No. 3, International Bhd. Of Electrical Workers, AFL—CIO,* 467 F.2d 1158, 1159 (2d Cir.1972); *Building Indus. Fund v. Local Union No. 3, International Bhd. of Elec. Workers, AFL—CIO,* 992 F.Supp. 162, 183 (E.D.N.Y.1996), *aff'd* 141 F.3d 1151, 1998 WL 88086 (2d Cir.1998). Norton has presented no evidence that the Reynolds employees, who also were shop stewards, were acting within the scope of their authority as Union representatives or as agents of the Union while engaged in the alleged harassing behavior. Accordingly, the Union cannot be held liable for the discriminatory actions of Reynolds employees who also happen to be shop stewards.

Lastly, Norton's allegations that the Union acted in an arbitrary or discriminatory manner or in bad faith are not supported by the evidence. There is no evidence that the Union has refused to file grievances on Norton's behalf because she is a woman. The Union has submitted evidence that they successfully pursued grievances on her behalf in the past, see July 7, 1998 Peets Aff., at ¶¶ 4–6, and have continued to do so to date. July 7, 1998 Hicks Aff., at ¶¶ 41–48; 50–59. Similarly, other than her conclusory allegations, Norton has not submitted any evidence tending to prove her allegation that the Union refused to act on behalf of female members unless they filed a written grievance, while the Union would take immediate action upon the oral request of a male member. Accordingly, viewing the evidence in the light most favorable to Norton, the Court finds that no reasonable jury could conclude that the Union breached its DFR to Norton.

#### b. Badlam

■ The crux of Badlam's complaint against the Union is that she suffered an on-the-job injury and the Union refused to intervene on her behalf to find her light duty work, which refusal was on account of her sex. The Union moves for summary judgment against Badlam asserting that it did not breach its DFR. In particular, the Union contends that it contacted Reynolds to ascertain whether any vacancies were available to accommodate Badlam's need for light duty work, that Reynolds responded that there were no such vacancies, and, therefore, it did all that was required under the CBA.

Badlam responds that she attempted to return to work in a light duty status through Union president Peets throughout 1992, 1993, and 1994, and that Peets took no action to assist her. Badlam contends that the Union routinely found light-duty work for male employees while she had to fight for two years to get a light-duty position. Badlam further asserts that she was subjected to sexual harassment and that the Union refused to take any action on her behalf.

It is undisputed that Badlam was injured on the job, her injuries prevented her from performing in her usual position, and that she desired light duty work to accommodate her injury. Article XXIII of the CBA provides that:

> The Company and the Union *may* agree on the placement of an employee who is unable to perform the work in the job classification which [s]he held at the time of a compensable injury or disability incurred in the plant to any vacancy in the plant in which [s]he can satisfactorily fill. In the event [her] injury or disability is being contested, [s]he *may* be placed in such vacancy on a temporary basis pending final adjudication of [her] claim. (Emphasis supplied).

A plain reading of Article XXIII reveals that this provision is permissive and did not obligate either the Union or Reynolds to place Badlam in an alternative placement while she had medical restrictions. Accordingly, a failure to place Badlam in such a position, assuming one even existed, cannot form the basis of a breach of the

CBA. Moreover, the evidence suggests that the Union did look into a light duty position for Badlam, but that one was not available. Badlam Dep., at 94, 96, 98; July 1, 1998 Peets Aff., at ¶ 6.

Furthermore, Badlam failed to either request Union assistance or provide the Union with the necessary information to enable it to seek light duty placement for her. The Union has submitted undisputed evidence that Badlam did not provide the necessary medical information required for it to aid her in obtaining light duty work until mid to late 1994.[8] In July 1994, Badlam's attorney, Mr. Nichols, wrote the Union requesting assistance in obtaining light duty work for Badlam. *See* Nichols' July 27, 1994 Letter to Peets. However, as of July 31, 1994, Badlam was still on a list of employees requiring medical clearance before returning to work. *See* July 1, 1998 Peets Aff., Ex. "A". By letter dated August 2, 1994, the Union responded to Nichols stating that "[a]s of this date I have nothing I can act on in her behalf. If your firm has any information regarding her medical condition or any other documents she has filed, please send them and all correspondence to me and I will act on them immediately." *See* Peets' Aug. 2, 1994 Letter to Nichols. There is no evidence in the record that Badlam ever provided the Union or Reynolds with the necessary medical documentation. *See* July 1, 1998 Peets Aff., Ex. "E". Rather, Badlam did not submit the requisite medical information until November 1994, at which time Reynolds determined that she could return to her usual job classification. Thus, Badlam was immediately returned to her position in the Cast House. Finally, Badlam has not submitted any evidence demonstrating that a vacancy was available that she could satisfactorily fill or that the Un-

ion routinely assisted male employees in securing light duty work while refusing to do so for females.[9] Thus, there is no evidence of a any discriminatory conduct on the part of the Union.

For reasons previously articulated with respect to Norton, the Court finds no merit to Badlam's allegations that the Union was aware that she was being sexually harassed, but declined to take any action. Badlam's deposition testimony reveals that the Union knew that she believed herself to be the victim of sexual harassment, but that she never requested the Union to pursue a grievance on her behalf. Badlam Dep., at 66, 92, 123–24, 130, 145–46, 223–24, 226, 466, 488, 491, 497, 502 ("I did not ask them to do a grievance. I just complained to [the Union]."), 539. "Because [Badlam] did not ask the Union to process a grievance on this issue, [she] cannot complain that the Union failed to represent [her] properly." *Flanigan*, 942 F.2d at 829 (citing *Mechmet*, 825 F.2d at 1178–79; *Stelling v. International Bhd. of Elec. Workers Local Union No. 1547*, 587 F.2d 1379, 1391 (9th Cir.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979); *Babrocky v. Jewel Food Co.*, 645 F.Supp. 1396, 1424 (N.D.Ind.1986); *Harbers v. Shop 'N Save Warehouse Foods, Inc.*, 605 F.Supp. 244, 246 (S.D.Ill.1985)).

Turning to Badlam's allegations that she was sexually harassed by a shop steward, the Union is not liable for actions taken by a Shop Steward when he is acting in his individual capacity. *See N.L.R.B. v. Local 815, International Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of America*, 290 F.2d at 104; discussion *supra* at ——.

For the foregoing reasons, no reasonable minded jury could conclude that there

---

8. Badlam asserts that she provided the Union with the necessary information by May 1994. The Union contends that she never provided it with such information. Badlam's depositions testimony, however, reveals that she never fully informed the Union of her medical restrictions. Badlam Dep., at 455–461.

9. In fact, such a contention is belied by the Union's efforts to place McGregor in a light duty position. In addition, the Union has submitted an affidavit identifying two other females that have been placed under CBA Art. XXIII.

was a breach of the CBA or that the Union permitted a breach to go unrepaired.

### c. McGregor

 McGregor's Complaint against the Union also must be dismissed. The undisputed evidence demonstrates that McGregor suffered an on-the-job injury resulting in certain medical restrictions being placed on her ability to work and preventing her from performing in her usual job classification and that the Union successfully worked with her to obtain light duty work in the maintenance department. Each time McGregor wished to pursue a grievance regarding her light duty assignments, the Union represented her through the Third Step.

For example, in March 1995 the Union represented McGregor in her grievance complaining that Reynolds failed to reevaluate her medical restrictions. The Union represented her at the Second Step where the grievance was denied because the vacancy in the maintenance department to which she had been placed no longer existed, McGregor's medical restrictions were reevaluated, and, as a result, she was returned to the labor pool. The Union continued to represent McGregor to the Third Step where the grievance was again denied because "McGregor was properly returned to the Labor Pool on or about March 15, 1995 ... [her] 'situation' was evaluated and the vacancy under which she was placed no longer existed due to a reduction in force in the Maintenance Service Department." See Oct. 16, 1995 Carey Letter to Jim Peets.

The Union also assisted McGregor through the Third Step in a similar grievance complaining that Reynolds unlawfully terminated her. McGregor again sought to be returned to her light duty position pursuant to CBA Article XXIII. This grievance also was denied because: (1) McGregor was not terminated, but was out on sick leave; (2) she could not return to the maintenance position pursuant to CBA Article XXIII because no vacancies existed; and (3) her medical restrictions pre-

cluded her from returning to her usual job classification.

The Union ultimately assisted McGregor in changing her permanent position to the maintenance department where she apparently continues to work.

With respect to McGregor's complaints of sexual harassment, the evidence similarly demonstrates that the Union took action on her behalf. Upon receiving complaints of inappropriate behavior or obscene materials at Reynolds, the Union spoke to the individual involved and removed the offensive material. McGregor fails to point to any other evidence where the Union failed to take action in response to complaints of sexual harassment or discrimination. Further, her deposition testimony reveals that she did not report or ask for Union assistance with respect to instances of alleged sexual harassment and, thus, the Union had no further obligation. See McGregor Dep., at 60–62, 64–76, 111–114, 239, 259.

As with Norton and Badlam, any alleged discrimination by Reynolds employees who also acted as Union stewards is insufficient to impute liability upon the Union without a showing that those individuals were acting in their capacity as, or agents of, the Union. McGregor has failed to make such a showing.

Based upon the above undisputed facts, no reasonable minded jury could conclude that the Union permitted a breach of the CBA to go unrepaired.

### 2. Retaliation

 The plaintiffs next claims that the Union retaliated against them in violation of Title VII. To establish a *prima facie* case of retaliation, plaintiffs must demonstrate that: (1) they participated in a protected activity known to the Union; (2) they suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. See *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139

L.Ed.2d 404 (1997); *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991).

■ Here, Norton continues to work in Reynolds' Cast House and has failed to identify what adverse employment action she has suffered as a result of participation in a protected activity known to the Union. Badlam was not fired, demoted, or the subject of any adverse employment action. Badlam voluntarily left Reynolds in April 1995 to work for General Motors. The only arguable adverse employment action was her inability to obtain light duty work. As noted, however, she was not entitled to light duty work and failed to set forth any evidence that a vacancy for a light duty position existed for which she was qualified.

McGregor claims that she was removed from her position in a light duty assignment in retaliation for her having filed a charge of discrimination with the EEOC. Of course, she was not entitled to a light duty position and there is no evidence that the Union caused her to be removed from a light duty position. Nonetheless, the Union has pointed to evidence that there was a legitimate, non-retaliatory reason for the complained of action. *See Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998). In particular, documentary evidence submitted demonstrates that there were no vacancies in the maintenance department available for McGregor because of a reduction in force. *See* Peets Aff., Exs. "C"–"G". Plaintiff has failed to respond with sufficient proof for a reasonable jury to find the proffered legitimate reason to be a pretext for impermissible retaliation. *See Gallagher*, 139 F.3d at 349.

Further, as previously noted, there is no evidence that the Union acquiesced in sexual harassment at Reynolds in retaliation for plaintiffs having engaged in protected activity. With respect to Norton, the evidence demonstrates that the Union attempted to resolve her problems informally and advised her to file a complaint with personnel or contact company headquarters if she wished to pursue the matter further. *Compare Johnson*, 931 F.2d 203. Norton never requested that the Union process a formal grievance on her behalf in connection with her allegations of sexual harassment. Badlam and McGregor similarly never requested that the Union pursue a sexual harassment grievance on their behalf.

Finally, plaintiffs do not point to any evidence demonstrating a causal connection between any protected activity and an adverse employment action. Accordingly, plaintiffs retaliation claims must be dismissed.

For the foregoing reasons, plaintiffs' claims pursuant to Title VII and the Human Rights Law against the Union are dismissed.

### D. Continuing Violation Doctrine

Finally, Reynolds moves to dismiss an alleged occurrence of sexual harassment occurring in 1991 relating to an injury sustained by Badlam and McGregor (the "dust collector incident") on the ground it is time barred.[10] Plaintiffs respond that they have been subjected to a ongoing policy of discrimination and, therefore, any conduct alleged to have occurred more than 300 days prior to the filing of the EEOC charge may be considered under the continuing violation doctrine.

■ "The continuing-violation exception 'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations.'" *Quinn*, 159 F.3d at 765 (quoting *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998)). "'[M]ultiple incidents of discrimination, even similar ones,

---

10. Badlam and McGregor assert that they were outside cleaning a dust collector when a male employee inside the plant intentionally turned on the dust collector causing them personal injuries.

that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'" *Id.* (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994)). "However, a continuing violation may be found 'where there is proof of specific on-going discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Id.* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994)).

 Here, the evidence is sufficient to enable a jury to infer a persistent failure by Reynolds to rectify plaintiffs complaints of sexual harassment thereby entitling them to invoke the continuing violation doctrine. However, the dust collector incident in 1991 does not fall within the continuing violation doctrine because this incident is unlike the other claimed incidents of sexual harassment and it is not sufficient as a matter of law to support a claim of sex discrimination. Plaintiffs have proffered no evidence that the dust collector was activated because of their gender. The unequivocal evidence demonstrates that the individual who activated the machine did not know, and could not have known, that plaintiffs, or any other persons, were working on the dust collector. Thus, the 1991 dust collector incident is not actionable.

### E. State Law Negligence Claims

Plaintiffs have conceded that the negligence causes of action be dismissed.

### F. Norton's Defamation Claim

Plaintiff Norton has asserted a claim for defamation arising out of the publication of a cartoon depicting her in a sexually offensive manner. Defendants move to dismiss this claim on the ground that it is time-barred and there is no evidence that the cartoon was written at the direction of, or on behalf of, Reynolds or the Union.

Pursuant to N.Y.C.P.L.R. § 215(3), an action to recover damages for libel or slander must be commenced within one year of accrual. Although the Complaint alleges that Norton found the cartoon on December 25, 1994, her deposition testimony demonstrates that she discovered it in January 1993. *See* Norton Dep., at 505–10. The Complaint was not filed until August 1995, more than one year from the date her defamation cause of action accrued. Plaintiff has not demonstrated her entitlement to any tolling period and, thus, her defamation action is barred by the statute of limitations.

### III. CONCLUSION

For the foregoing reasons, Reynolds' motion for summary judgment is GRANTED IN PART and plaintiffs' negligence and defamation claims are DISMISSED in their entirety. Reynolds' motion is DENIED in all other respects. The Union's motion for summary judgment is GRANTED and all causes of action against it are DISMISSED in their entirety.

**IT IS SO ORDERED**