**Katrina L. DYKE, Plaintiff,**

v.

**Greg J. McCLEAVE d/b/a Guaranteed Integrity, Defendant.**

**No. 98–CV–1642(TJM/GLS).**

United States District Court, N.D. New York.

Jan. 14, 2000.

matter.

**99**

MEMORANDUM–DECISION
& ORDER

McAVOY, Chief Judge.

Plaintiff Katrina Dyke brings the instant action against Defendant Greg McCleave d/b/a Guaranteed Integrity, alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq* .. Plaintiff also asserts pendent state law claims under N.Y.Exec. Law § 290 *et seq.* and for intentional infliction of emotional distress. Plaintiff seeks declaratory and injunctive relief, monetary damages, and attorney's fees. Defendant asserts a counterclaim for attorney's fees and costs in the sum of $12,000.00, pursuant to Fed.R.Civ.P. 11. Presently before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56.

**I. Background**

Because this is a motion for summary judgment by the defendant, the following facts are presented in the light most favorable to the plaintiff. *See Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 316 (2d Cir.1999); *Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Plaintiff, a female, was hired by Defendant in June 1996 as a telemarketer and messenger in Defendant's Ogdensburg, New York office. Defendant's telemarketing business solicits funds for fire departments, police departments, and other organizations located throughout upstate New York. Defendant retained eighty-percent of the funds collected, and remitted the remaining twenty-percent to the sponsor organization. Ron Furman was employed as the manager of Defendant's Ogdensburg office and, thus, functioned as Plaintiff's direct supervisor. Furman oversaw the operations of the Ogdensburg office, made all personnel decisions (e.g., hiring, firing, hourly rates, and work schedules), and directly interacted with Defendant's clients. In sum, he was in control of all facets of the Ogdensburg office's opera-

Law Offices of Monroe J. Korn, New York City (Monroe J. Korn, of counsel), for plaintiff.

Law Offices of Jerry C. Leek, Potsdam, NY (Jerry C. Leek, of counsel), for defendant Greg McCleave.

tions. *See* Deposition of Greg McCleave ("McCleave Dep."), at 30–35. Furman held himself out as a representative of Guaranteed Integrity, the name under which Defendant McCleave maintains his business. *See id.* at 35. During Plaintiff's employment at Defendant's Ogdensburg office from June 1996 through August 1996, Plaintiff alleges that Furman frequently used profanity and referred to her and other female employees in a derogatory, gender-based manner. Defendant's Ogdensburg office closed in August 1996 after its fund raising activities ended.

On or about October 7, 1996, Plaintiff was re-hired by the Defendant as a telemarketer in Defendant's Massena, New York office.[1] The Massena office was also run by Furman, who made all personnel decisions, set the wages and work schedules, and collected pledges made in connection with phone solicitations. Defendant acknowledges that Furman hired and trained all employees at the Massena office and managed the office's daily operations. *See* McCleave Dep., at 46. During her tenure at the Massena office, Plaintiff's duties expanded to collecting pledges and functioning as Furman's personal chauffeur.[2] Plaintiff worked four days a week and her salary was based on the greater of an hourly rate or a commission based on a percent of the donations she solicited.

During her employment at Defendant's Massena office, Plaintiff alleges that Fur-

man repeatedly and intentionally sexually harassed her. Specifically, Plaintiff contends that Furman referred to her as a "cunt," "slut," "whore," "lesbian," "dyke," "pig," "bitch," "mother-fucker," "stupid cunt," and other gender-based derogatory names. *See* Dyke Aff. at 12; Deposition of Katrina Dyke ("Dyke Dep."), at 22; Affidavit of Bonnie Frary ("Frary Aff."), at ¶¶ 3, 6–7; Affidavit of Jolene Boudell ("Boudell Aff."), at ¶¶ 5–6; Compl. at ¶ 16. Although Furman was not selective in who he addressed with such language—directing these and other offensive comments at both male and female employees at the Massena office—Plaintiff was apparently on the receiving end of the majority of Furman's profanity.[3] *See* Boudell Aff. at ¶¶ 5–6. Furman admits that he called Plaintiff these names on a daily basis, and that Plaintiff referred to him as a "cocksucker" and "faggot." Deposition of Ronald Furman ("Furman Dep."), at 21. Plaintiff, however, denies calling Furman these names. Furman also admits that Plaintiff purchased alcohol for him at various times during the work week and that he consumed the alcohol in a "Mellow Yellow" soda bottle. *See id.* at 22. Defendant was aware of Furman's on-the-job drinking and characterizes Furman as having "a drinking problem." McCleave EBT, at 48–51. Defendant also admits that Furman had a "temper problem" and

---

1. Plaintiff's sexual harassment claim relates solely to Furman's actions and Defendant's inaction, which allegedly occurred over the forty-two (42) day period from October 7, 1999 through December 7, 1999 when Plaintiff worked at Defendant's Massena, New York office following the closing of Defendant's Ogdensburg office. *See* Affidavit of Katrina L. Dyke ("Dyke Aff."), at ¶ 8. Accordingly, Plaintiff's allegations with respect to allegations and events occurring prior to Plaintiff's employment at the Massena office were not considered by the Court in connection with Defendant's instant motion. The Court notes, however, that Plaintiff raises similar allegations with respect to events that occurred while she was supervised by Furman at Defendant's Ogdensburg and Massena offices.

2. Plaintiff contends that her chauffeur duties included purchasing alcohol for Furman that he allegedly consumed during work hours, driving him to local bars almost every night after work, and dropping him off at a motel near the office where he lived during the Massena, New York fund raising activities. *See* Dyke Aff. at ¶ 11; Compl. at ¶ 17.

3. Ms. Boudell and Ms. Frary, Plaintiff's coworkers, allege in their affidavits that Furman called Richard Oaks, another employee at the Massena office, a "fag," "queer," and "cocksucker." *See* Boudell Aff. at ¶ 6; Frary Aff. at ¶ 7.

observed Furman using foul language with employees under his control.[4] *Id.* at 52.

Plaintiff's pleas to Furman to cease his behavior towards her went unanswered and Furman threatened retaliation against Plaintiff if she chose to "cross him." *See* Dyke Aff. at ¶ 14. This retaliation included threats to burn down her parent's home and a fear of losing her job. *See id.* Plaintiff was also told by Furman that it would be futile to inform the Defendant of her complaints as "[Defendant] was his best friend and that he was the best man at the [Defendant's] wedding." [5] *Id.* Plaintiff communicated Furman's threats towards her to Bonnie Frary, her co-worker. *See id.* at ¶ 15; Frary Aff. at ¶ 8. Frary's efforts to remedy the situation by confronting Furman on Plaintiff's behalf proved unsuccessful, as Furman told Frary to "fuck off.". *See* Frary Aff. at ¶ 8. Plaintiff also contends that Defendant "was fully aware of Furman's behavior and drinking problems, but took no actions to prevent him from continuing his sexual harassments and threats to the [P]laintiff and other employees of the [D]efendant." Compl. at ¶ 24.

On December 7, 1996, prior to the end of Defendant's fund raising campaign in Massena and Furman's discharge, Furman laid off Plaintiff. Before leaving, Plaintiff informed Furman that she planned to file for unemployment for the period she was unemployed by Defendant.[6] Furman allegedly told Plaintiff that she would lose her job permanently if she filed for unemployment and that the company would go bankrupt. Furman proceeded to give Plaintiff the option of taking $200.00 in lieu of filing for unemployment. If, however, Plaintiff chose to file for unemployment,

Furman promised to make sure that she would never receive that money and, moreover, would require Plaintiff to work one hour a day all through the holiday season. Submitting to Furman's threats, Plaintiff did not file a claim for unemployment and did not accept the $200.00 payment offered by Furman. *See* Dyke Aff. at ¶ 16.

Defendant, however, disclaims any awareness of Furman's actions towards Plaintiff and the other employees and contends that he learned of Furman's profanity and drinking during work hours only after Bonnie Frary, Plaintiff's co-worker, contacted him in November 1996. *See* McCleave Aff. at ¶¶ 4–5; McCleave EBT, at 55. Indeed, Defendant claims that he was first made aware of Plaintiff's claim of sexual harassment only after receiving a Notice of Charge from the EEOC around May 1997. *See* McCleave Aff. at ¶ 10. In response to complaints made by Defendant's employees regarding Furman's conduct, Defendant fired Furman around mid-December 1996. *See* McCleave Dep., at 58. Soon thereafter, near the end of December 1996, Defendant closed his Massena telemarketing operations and Plaintiff never returned to her position at that office. Following the closing of the Massena office, Plaintiff again began working for the Defendant in his Watertown, New York office. That office was managed by Tim LaMay. Plaintiff's tenure, however, lasted for only one day and since that time Plaintiff has not worked for the Defendant.

Plaintiff filed an administrative charge with the EEOC in May 1997. *See* Compl. at ¶ 6. On or about August 14, 1998, Plaintiff received a Right–To–Sue Letter and timely filed her federal Complaint on October 21, 1998. *See id.* at ¶ 7. Defendant

---

**4.** Defendant acknowledges that Furman often used the "F word." *See* McCleave Dep., at 53.

**5.** Plaintiff contends that Furman told her that if she reported her complaints to the Defendant, "he would fuck [her] over in [her] life so bad that [she] would rather die." Dyke Aff. at ¶ 14.

**6.** Plaintiff's concerns about collecting a paycheck were apparently heightened by the onset of the Christmas holiday season and the need to purchase gifts and pay off her debts. *See* Dyke Aff. at ¶¶ 14, 16.

now moves, pursuant to FED.R.CIV.P. 56, to dismiss all claims alleged in the Complaint.

## II. Discussion

### A. Treatment of Defendant's Motion

Although Defendant's Notice of Motion seeks dismissal of all of Plaintiff's causes of action, *see* Notice of Motion, at 1 (Docket No. 17), Defendant's Memorandum of Law only addresses Plaintiff's sexual harassment (hostile work environment) claim under Title VII. *See* Def.Mem. of Law at 1–8. Accordingly, the Court's decision is limited to Plaintiff's *prima facie* sexual harassment claim under Title VII and N.Y.EXEC.LAW 290 *et seq.*, which is analyzed under the same legal standards as those applicable to Title VII claims. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir.1996); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–15 (2d Cir.1996); *Tomka v. The Seiler Corp.*, 66 F.3d 1295, 1305 n. 4 (2d Cir. 1995). However, the analysis under federal and state law differ on the question of employer liability. *See Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F.Supp.2d 477, 485 (S.D.N.Y.1999); *Ponticelli v. Zurich Am. Ins. Group*, 16 F.Supp.2d 414, 427–28 (S.D.N.Y.1998) ("Claims under the HRL are similar to sexual harassment claims under Title VII and can be examined identically for summary judgment purposes, 'at least as far as determining whether sexual harassment has taken place.' ") (quoting *Seepersad v. D.A.O.R. Sec., Inc.*, 1998 WL 474205, at *3 (S.D.N.Y. Aug.12, 1998)) ("Employer liability under the [New York State Human Rights Law] differs from [Title VII] . . . in that under the NYSHRL, 'an employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.' ") (quoting *State Div. of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985)). The standards set forth by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275,

141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) for determining employer liability in sexual harassment cases "applies only to plaintiff's Title VII claim, for it is not certain whether New York courts will follow the Supreme Court in establishing employer liability standards for sexual harassment under the NYSHRL." *Seepersad*, 1998 WL 474205, at *4. Notably, the decisions in *Faragher* and *Burlington Industries* were both decided prior to Plaintiff's initiation of the instant litigation. Because Defendant's Memorandum of Law solely addresses Plaintiff's Title VII claim—and the legal standards under federal and state law vary on the question of employer liability—the Court will only address the employer liability issue with respect to Plaintiff's sexual harassment claim under Title VII. Moreover, because Defendant failed to present any legal arguments with respect to Plaintiff's intentional infliction of emotional distress claim, that claim was also not considered by the Court in connection with Defendant's instant motion. *See Burma–Bibas, Inc. v. Excelled Leather Coat Corp.*, 584 F.Supp. 1214, 1218 (S.D.N.Y.1984).

### B. The Standard for Summary Judgment

The standard for summary judgment is well-settled. Under FED.R.CIV.P. 56(c), if there is no genuine issue as to any material fact, the moving party is entitled to a judgment as a matter of law "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). The moving party bears the initial burden of "informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, to-

gether with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R.CIV.P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. 1348. A dispute regarding a material fact is genuine if a reasonable jury could return a verdict for the non-moving party; that is, whether the non-movant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds, however, could not differ as to the import of the evidence, then summary judgment is proper. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), the motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348); *see also Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). Indeed, the non-moving party's op-position may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e).

Although it is well-settled that "conclusory allegations of [sexual harassment] are insufficient to satisfy the requirements of Rule 56(e)," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (citations omitted); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997), the Court is mindful that hostile work environment claims may not be suited for resolution on summary judgment because they often involve "mixed question[s] of law and fact." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 437 (2d Cir.1999); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998) ("Summary judgment should be used 'sparingly' when, as is often the case in sexual harassment claims, state of mind or intent are at issue."). As the Second Circuit recently noted in the context of a plaintiff's hostile work environment claim:

> Such mixed questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue. Although such questions may be ripe for summary adjudication where the underlying facts are undisputed, that the facts are undisputed does not automatically mandate summary judgment; rather, *summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion.*

*Richardson*, 180 F.3d 426, 437–38 (2d Cir. 1999) (internal quotations and citations omitted) (emphasis added).

## C. Plaintiff's Prima Facie Hostile Work Environment Claim

Title VII makes it unlawful for an employer to discriminate against any individual with respect to the "compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Courts have recognized that Title VII is not limited to economic or tangible discrimination, but extends to "sexual harassment so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher*, 118 S.Ct. at 2283 (internal quotations and citations omitted); *Schwapp*, 118 F.3d at 110 (" 'Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.' ") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

█ In the present case, Plaintiff Katrina Dyke brings a claim of sexual harassment under a hostile work environment theory. To prevail on her hostile work environment claim, Plaintiff must show: "(1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.' " *Richardson*, 180 F.3d at 436 (brackets in original) (quoting *Schwapp*, 118 F.3d at 110) (citation and internal quotation omitted); *Torres v. Pisano*, 116 F.3d 625, 630–31 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To be actionable, the conduct at issue must objectively *and* subjectively create a hostile or abusive work environment. *See Faragher*, 118 S.Ct. at 2283 ("[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); *Richardson*, 180 F.3d at 436 ("[A] Title VII hostile environment claim will succeed only where the conduct at issue is so severe or pervasive

as to create an objectively hostile or abusive work environment, and where the victim subjectively perceive[s] the environment to be abusive.") (internal quotation omitted) (citing *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367); *Schwapp*, 118 F.3d at 110.

In determining whether an environment is sufficiently hostile or abusive to support a Title VII claim, courts examine the totality of the plaintiff's circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance;' (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson*, 180 F.3d at 437 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367); *see also Faragher*, 118 S.Ct. at 2283; *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269 (2d Cir.1999); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767–68 (2d Cir.1998); *Badlam v. Reynolds Metals Co.*, 46 F.Supp.2d 187, 194 (N.D.N.Y.1999). Consistent with the approach adopted by the Second Circuit, this non-exclusive list of factors "must be considered 'cumulatively,' so that [the Court] may 'obtain a realistic view of [Plaintiff's] work environment.' " *Richardson*, 180 F.3d at 437 (quoting *Schwapp*, 118 F.3d at 111).

In assessing a plaintiff's allegations under these standards, courts have held that "[i]solated incidents or episodic conduct will not support a hostile work environment claim." *Richardson*, 180 F.3d at 437 (citing *Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.")); *see also Faragher*, 118 S.Ct. at 2283 (" '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' ") (internal citation omitted); *Schwapp*, 118 F.3d at 110–11; *Quinn*, 159 F.3d at 768. Rather, "[t]he harassment at

issue must be 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.'" *Kotcher,* 957 F.2d at 62 (quoting *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. 2399); *see also Torres,* 116 F.3d at 631 ("The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases."). The Court is mindful, however, that, "[a]lthough isolated, minor episodes of harassment do not merit relief under Title VII, even a single episode of harassment, if severe enough, can establish a hostile work environment." *Richardson,* 180 F.3d at 437 (internal quotation and citation omitted); *see also Torres,* 116 F.3d at 631; *Tomka,* 66 F.3d at 1305.

### 1. The Work Environment at the Massena Office

■ After carefully reviewing the evidence submitted by the parties in connection with Defendant's motion for summary judgment, including deposition and affidavit testimony, the Court finds that a reasonable juror could infer that the quality and quantity of the comments and events in question were sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment for the worse and create a hostile work environment.

Plaintiff has presented evidence that she was repeatedly subjected to sexual innuendo and rude and offensive comments by Furman. Specifically, Furman *admits* that he repeatedly used profanity in his communications with Plaintiff and, *on a daily basis,* referred to her and other female employees as a "cunt," "slut," "whore," "lesbian," "dyke," "pig," "bitch," "mother-fucker," "stupid cunt," and other similar derogatory names. *See* Furman Dep., at 21; *see also* Dyke Aff. at 12; Dyke Dep. at 22; Frary Aff. at ¶¶ 3, 6–7; Boudell Aff. at ¶¶ 5–6; Compl. at ¶ 16. A careful review of the documentary evidence submitted by the parties reflects that Furman's statements and conduct towards Plaintiff (which are not in dispute) were not isolated, sporadic instances; rather, they were "part and parcel of [Plaintiff's] every day life," at the Massena office during the two-month period Plaintiff worked under Furman's supervision. *Badlam,* 46 F.Supp.2d at 196; *see also Kotcher,* 957 F.2d at 62; *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 578 (2d Cir.1989).

The offensive conduct of which Plaintiff complains is similar to conduct that other courts have found sufficient to demonstrate a hostile work environment for purposes of a motion for summary judgment. *See Torres,* 116 F.3d at 628, 633 (references to plaintiff as a "dumb cunt" and sexual innuendos and graphic sexual overtures established a "strong prima facie case of sexual harassment"); *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996) ("It is beyond dispute that evidence that a woman was subjected to a steady stream of vulgar and offensive epithets because of her gender would be sufficient to establish a claim under Title VII.") (quotation omitted); *Burns v. McGregor Electronic Indus., Inc.,* 989 F.2d 959, 964 (8th Cir.1993) (use of words "bitch," "slut," and "cunt" to a woman constituted harassment based on her sex); *Badlam,* 46 F.Supp.2d at 191 ("old cunt," "slut," "whore," "bitch," "dyke," and "prostitute").

Plaintiff also has adequately demonstrated that the alleged conduct could reasonably be perceived, and was perceived, as a hostile environment. *See* Dyke Aff. at ¶¶ 9, 12, 19–20. That Plaintiff was personally offended by Furman's comments is clear by Plaintiff's complaints to Furman and her pleas to Furman that he stop calling her "these vile names" because it embarrassed her. *See id.* at ¶ 12. Plaintiff reported her complaints regarding Furman to her co-worker, Bonnie Frary, in what proved to be an unsuccessful attempt to have someone other than the Plaintiff appeal to Furman. *See* Dyke Aff. at ¶ 15; Frary Aff. at ¶ 8. With respect to

the objectivity requirement, a fair-minded jury could reasonably conclude that Plaintiff, and other employees, would find their working conditions altered for the worse and abusive when an office manager/supervisor refers to them as a "cunt," "slut," "whore," "lesbian," "dyke," "pig," "bitch," "mother-fucker," "stupid cunt," and other gender-based derogatory names, and repeatedly uses profane and otherwise offensive language when referring to them. *See Torres*, 116 F.3d at 633. Contrary to Defendant's characterization of the events and circumstances surrounding Plaintiff's allegations, this is not merely a case of "bantering and joking" between co-workers. Def.Mem. of Law at 5. Thus, if a reasonable trier of fact were "to credit [Plaintiff's] ... allegations of constant abuse, which were confirmed by [some of Plaintiff's] co-workers," *Torres*, 116 F.3d at 631, he or she could reasonably conclude that Furman's actions and conduct constituted a hostile work environment.

### 2. Whether the Harassing Conduct Was Motivated By Gender

It is not enough that Plaintiff was subjected to harassment; rather, Plaintiff is required to show that the harassment complained of was gender-based. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (citing *Meritor Sav. Bank*, 477 U.S. at 63–66, 106 S.Ct. 2399). Defendant argues, in part, that Furman's behavior towards Plaintiff was similar to his behavior towards the other employees at the Massena office and, thus, was not gender-based. Although there is evidence in the record to suggest that Furman used profanity and offensive language in his conversations with both male and female employees under his supervision, there is also evidence that certain harassment was directed only at Plaintiff. *See, e.g., Badlam*, 46 F.Supp.2d at 196–97. Indeed, the record is replete with numerous instances where Furman admits calling Plaintiff a "cunt," "slut," "whore," "lesbian," "dyke," "pig," "bitch," "mother-fucker," "stupid cunt,"

and other gender-based derogatory names. *See* Furman Dep., at 21; *see also* Dyke Aff. at 12; Dyke Dep. at 22. Accordingly, the Court finds that a reasonable fact-finder could characterize the offensive conduct described above as linked to Plaintiff's gender and, thus, can fairly said to be gender-based. *See, e.g., Williams v. General Motors Corp.*, 187 F.3d 553, 565–66 (6th Cir.1999) ("The myriad instances in which [Plaintiff] was ostracized, when others were not, combined with the gender-specific epithets used, such as 'slut' and 'fucking women,' create an inference, sufficient to survive summary judgment, that her gender was the motivating impulse for her co-workers' behavior.") (footnote omitted); *Winsor*, 79 F.3d at 1000 (noting that the sexual epithets "whore," "floor whore," "curb whore," "curb side cunt," and "bitch" "have been identified as intensely degrading to women") (internal quotation and citations omitted); *Burns*, 989 F.2d at 964 (noting that the terms "bitch," "asshole," "slut," and "cunt" amounted to obscene name-calling and constituted harassment based on sex) (quotation omitted); *Badlam*, 46 F.Supp.2d at 197 (noting that the terms "cunt," "dyke," "bitch," and "whore" are gender-specific); *Lauro v. Tomkats, Inc.*, 9 F.Supp.2d 863, 871 (M.D.Tenn.1998) (noting that the terms "babe," "dyke," "prostitute," "bitch," and "whore," are gender-specific names and obscenities); *E.E.O.C. v. A. Sam & Sons Produce Co., Inc.*, 872 F.Supp. 29, 35 (W.D.N.Y.1994) ("[T]he term 'whore' is usually gender-specific and is certainly more offensive when directed at a woman. Thus the inference is sufficiently strong that [the conduct at issue] was directed at [plaintiff] because she was a woman.") (footnotes omitted).

### 3. Whether Furman's Alleged Conduct Was "Unwelcomed"

In seeking to dismiss Plaintiff's claim of sexual harassment, Defendant principally argues that Plaintiff's "willing and frequent involvement in sexual innuendos

prevalent in her work area" support a finding that she "welcomed" Furman's comments and actions.[7] Def.Mem. of Law at 4. Thus, Defendant contends that he should not be held liable for "for conditions created by [Plaintiff's] own action and conduct." *Reed v. Shepard,* 939 F.2d 484, 491 (7th Cir.1991) (affirming district court's dismissal of plaintiff's sexual harassment claim where plaintiff's behavior manifested an "enthusiastic receptiveness to sexually suggestive jokes and activities."); *see also Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that plaintiff did not welcome her co-workers' harassing behavior because "[plaintiff's] violent resentment of the conduct of her co-workers toward her [was] plain.") (Coffey, J., dissenting); *Carrero,* 890 F.2d at 578 (requiring the plaintiff-employee to establish that the conduct of which she complains was unwelcome); *Lucas v. South Nassau Communities Hosp.,* 54 F.Supp.2d 141, 148 (E.D.N.Y.1998) ("A complainant's sexually provocative speech or dress is relevant in determining whether he or she found particular sexual advances welcome."); *Weinsheimer v. Rockwell Int'l Corp.,* 754 F.Supp. 1559, 1564 (M.D.Fla.1990) ("[P]laintiff's willing and frequent involvement in the sexual innuendo prevalent in her work area indicate that she did not find the majority of such conduct truly 'unwelcome' or 'hostile'."), *aff'd,* 949 F.2d 1162 (11th Cir.1991); *Loftin–Boggs v. City of Meridian, Miss.,* 633 F.Supp. 1323, 1327 (S.D.Miss.1986) ("Considering plaintiff's contribution to and apparent enjoyment of the situation, it cannot be said that the defendants created 'an intimidating, hostile, or offensive working environment.' "), *aff'd,* 824 F.2d 971 (5th Cir.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988). While the Court recognizes that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome'," *Meritor Sav. Bank,* 477 U.S. at 68, 106 S.Ct. 2399 (citing 29 C.F.R. § 1604.11(a)), such a finding is often best left for the jury because "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id.* Thus, because on a motion for summary judgment Plaintiff's contention that Furman's statements to her were unwelcome must be accepted as true, this determination, to the extent relevant under the particular circumstances of this case, should be left to the trier of fact and, thus, cannot be resolved at the summary judgement stage. *See, e.g., Smith v. County of Culpeper,* 1998 WL 964501, at *4 (W.D.Va. Dec.23, 1998) ("Plaintiff's own participation in sexually suggestive behavior is relevant in determining the totality

---

7. Specifically, Defendant argues that Plaintiff's sexual harassment claims should be dismissed because Plaintiff "not only ... fail[ed] to complain about the actions of Ron Furman, but joined in and participated in the office conduct." Def.Mem. of Law at 1 (Statement of Facts). Thus, the crux of Defendant's argument is that Plaintiff "welcomed the advances and conduct of ... Furman ... and that the Plaintiff and Ronald Furman socialized together frequently...." *Id.; see also* McCleave Aff., at ¶ 13. Defendant goes so far as to argue that Plaintiff's purchase of one drink for Furman after work "proves the point that [Plaintiff] welcomed [Furman's] conduct," McCleave Aff. at ¶ 11.

Defendant has submitted affidavit testimony suggesting a relationship between Plaintiff and Furman and numerous occasions where the two socialized together after work. *See*

Affidavit of Elaine Frederick, at ¶¶ 4, 8; Affidavit of Dorothy Jarvis, at 1; Affidavit of Sandy Rochefort, at ¶¶ 3–6; Deposition of Timothy LaMay, at 14; 18–22. Plaintiff denies these allegations and contends that the affidavits provided by Frederick, Rochefort, and Jarvis "are totally fabricated" and were prepared in return for Defendant's promise that they would not have to provide witness testimony at trial. *See* Dyke Aff. at ¶¶ 21–32. Plaintiff further contends that LaMay's testimony is "tainted since he has been convinced by the defendant that the outcome of the trial may affect his job with the defendant." *Id.* at ¶ 39. A careful review of the affidavit testimony alone reveals a significant dispute between the parties with respect to material events and circumstances underlying Plaintiff's sexual harassment claims.

of the circumstances, but is not, in and of itself, determinative.") (citing *Meritor Sav. Bank,* 477 U.S. at 69, 106 S.Ct. 2399), *aff'd,* 191 F.3d 448 (4th Cir.1999), *petition for cert. filed,* No. 99–987 (Dec. 8, 1999); *Weinsheimer,* 754 F.Supp. at 1564 n. 12 ("The Court does not hold that this plaintiff's, or any plaintiff's, participation in actions of a sexual or vulgar nature while at work will completely bar a claim of sexual harassment. Plaintiff simply must show that at some point she clearly made her coworkers and superiors aware that in the future such conduct would be considered 'unwelcome.' ").

### D. Applicability of the *Faragher/Burlington Industries* Affirmative Defense in the Case at Bar

■ In contrast to allegations of harassment by co-workers or customers, employers are subject to vicarious liability "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher,* 118 S.Ct. at 2293; *see also Richardson,* 180 F.3d at 441; *Leopold,* 174 F.3d at 268 n. 5; *Quinn,* 159 F.3d at 767 (citing *Burlington Indus., Inc.,* 118 S.Ct. at 2270; *Faragher,* 118 S.Ct. at 2292–93). The employer's strict liability for the acts of its supervisor may be avoided, however, in cases where the supervisor's harassment does not result in a tangible employment action taken against the plaintiff-employee. *See Faragher,* 118 S.Ct. at 2293; *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 294 (2d Cir.1999), *petition for cert. filed,* No. 99–1084 (Dec. 27, 1999); *Leopold,* 174 F.3d at 268 n. 5. In *Faragher* and *Burlington Industries,* the Supreme Court set forth the contours of the affirmative defense that an employer may raise in cases where an employee seeks to hold his or her employer strictly liable for the acts of the employee's supervisor:

When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 118 S.Ct. at 2293; *Burlington Indus., Inc.,* 118 S.Ct. at 2270 (citations omitted).

Thus, in cases such as the one presented here, the Court must first determine whether the supervisor's conduct constitutes a tangible employment action such that the employer is precluded from raising the affirmative defense available under *Faragher* and *Burlington Industries.*

As a general rule, a tangible employment action will typically occur in cases where the supervisor, "acting with the authority of the company," makes an employment decision that "inflicts direct economic harm" on the employee. *Burlington Indus., Inc.,* 118 S.Ct. at 2269. Elaborating on this point, the Supreme Court in *Burlington Industries* noted:

Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make *economic decisions affecting other employees under his or her control.* Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act.

*Id.* (emphasis added).

Such tangible employment action includes, *inter alia,* "a significant change in [the plaintiff-employee's] employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." *Id.* at 2268; *see also Faragher,* 118 S.Ct. at 2284 ("[T]here is nothing remarkable in the fact that claims against employers for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown.") (citing *Meritor Sav. Bank,* 477 U.S. at 70–71, 106 S.Ct. 2399) ("[C]ourts have consistently held employers liable for the discriminatory discharges of employees by supervisory personnel, whether or not the employer knew, should have known, or approved of the supervisor's actions"); *Brown v. Brody,* 199 F.3d 446, 456–57 (D.C.Cir.1999).

■ Based on these factors, the Court concludes that Furman's decision to lay-off Plaintiff—coupled with Plaintiff's loss of salary and Furman's alleged threat that Plaintiff would lose her job permanently if she chose to file for unemployment benefits—constitutes a tangible employment action sufficient to bar Defendant from availing itself of the *Faragher/Burlington Industries* affirmative defense.[8] *See, e.g., Ribando v. United Airlines, Inc.,* 200 F.3d 507, 510–11 (7th Cir.1999) ("[A] materially

adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.") (internal quotation omitted) (citing *Burlington Indus., Inc.,* 118 S.Ct. at 2268–69); *Savino v. C.P. Hall Co.,* 199 F.3d 925, 932–33 (7th Cir.1999) (noting that "a tangible employment action is akin to an adverse employment action" and that "[a] tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship."); *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 953 (7th Cir.1998) (citing *Gorniak v. National R.R. Passenger Corp.,* 889 F.2d 481, 484 (3d Cir.1989) (describing a discharge or layoff as "adverse economic circumstances")).

Moreover, focusing largely on Plaintiff's alleged relationship with Furman and her alleged participation in the office conduct of which she now complains, Defendant fails to dispute Plaintiff's contention that she was in fact laid off by Furman in early December or, alternatively, allege any le-

---

**8.** Having found that Defendant cannot avail itself of the *Faragher/Burlington Industries* affirmative defense, the Court (for the purposes of the instant motion) and the jury (for the purposes of trial) need not consider: (1) whether Defendant took reasonable measures in preventing and correcting Furman's alleged sexually harassing behavior including, but not limited to the existence of an anti-harassment policy with complaint procedures (the first prong of the *Faragher/Burlington Industries* affirmative defense), and whether (2) Plaintiff's failure to report Furman's alleged harassment to the Defendant was reasonable given Plaintiff's "arguably justifiable fear of reprisal" from Furman (the second prong of the *Faragher/Burlington Industries* affirmative defense). *See Meng v. Ipanema Shoe Corp.,* 73 F.Supp.2d 392, 401–02 (S.D.N.Y.1999); *see also Caridad,* 191 F.3d at 295–96 ("We do not doubt that there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to pre-

clude the employer's affirmative defense, it must be based on apprehension of what the employer might do, not merely on concern about the reaction of co-workers."); *Barrett v. The Applied Radiant Energy Corp.,* 70 F.Supp.2d 644, 652 (W.D.Va.1999) (and cases cited therein). The Court notes, however, that with respect to the first prong, Defendant does not address, nor does the record reflect, the existence or dissemination of any anti-harassment policy at the Massena office. *See Faragher,* 118 S.Ct. at 2293. With respect to the second prong, Plaintiff contends that she did not report Furman's conduct because she was "frozen with fear" based on Furman's threats to retaliate against anyone who turned him in. *See* Pl.Mem. of Law at 6–7. These threats included Plaintiff's loss of her job and the burning down of her family home. *See id.;* Dyke Aff. at ¶ 14. Plaintiff further contends that Furman told her that it would be futile to report him to the Defendant because Furman and the Defendant were best friends. *See* Pl.Mem. of Law at 6; Dyke Aff. at ¶ 17.

**110**

gitimate business reason for Defendant's decision to lay off Plaintiff in early December 1996. *See, e.g., Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 536 (1st Cir. 1996); *O'Sullivan v. The New York Times*, 37 F.Supp.2d 307, 316 (S.D.N.Y.1999). Furthermore, Furman does not allege, nor does the record reflect, that Plaintiff voluntarily resigned from her position with the Defendant. *See Smith v. Cashland, Inc.*, 193 F.3d 1158, 1160 (10th Cir.1999). Notably, at the time Plaintiff was laid off, the Massena office was still in operation. Defendant closed the Massena office some weeks later around the Christmas holiday season. Thus, Defendant fails to satisfy his burden under *McDonnell Douglas* to articulate a legitimate business reason for the undisputed tangible employment action taken against Plaintiff.[9]  *See, e.g., Richardson*, 180 F.3d at 445. Accordingly, Defendant is not entitled to summary judgment on the question of employer liability with respect to Plaintiff's hostile work environment claim.

### III. CONCLUSION:

For all of the foregoing reasons, Defendant's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

---

**9.** Plaintiff contends that Defendant waived any affirmative defense available under *Faragher* and *Burlington Industries* by failing properly to assert it affirmatively in its Answer. *See* Pl.Mem. of Law at 16. As noted earlier, the Supreme Court's decisions in *Faragher* and *Burlington Industries* were handed down prior to Plaintiff's initiation of the instant litigation. In its Answer, Defendant merely alleges, in its Second Affirmative Defense, that "[t]he Defendant was not aware of the alleged sexual harassment of the supervisor, Ron Furman." Answer at ¶ 16 (Docket No. 3). However, because the Court has determined that Defendant cannot avail itself of the *Faragher/Burlington Industries* affirmative defense based on the undisputed tangible employment action taken by Furman against Plaintiff, the Court need not consider whether Defendant's responsive pleading satisfies the requirements of FED.R.CIV.P. 8(c).